ESTATE OF Edward D. WHITE, by Suzanne WHITE, Administratrix; and Suzanne White, in her own right Plaintiffs,

v.

R.J. REYNOLDS TOBACCO COMPANY and Brown & Williamson Tobacco Corporation, Defendants.

No. S–97–4301.

United States District Court, D. Maryland.

July 25, 2000.

Donald S. Saiontz, Law Office, Baltimore, Md, Henry I. Greenberg, Greenberg Law Office, Baltimore, Md, Stephanie J. Hartley, Law Office, Jacksonville, FL, Norwood S. Wilner, Law Office, Jacksonville, FL, for Suzanne White, in her own right, plaintiff.

Denise A. Fee, Jones, Day, Reavis & Pogue, Washington, DC, Peter J. Biersteker, Jones, Day, Reavis & Pogue, Washington, DC, Paul R. Reichert, Geoffrey K. Beach, Jones, Day, Reavis & Pogue, Washington, DC, Wade R. Wright, Stephanie E. Parker, Kim Purcell Pike, Jones, Day, Reavis & Pogue, Washington, DC, Scott C. Walker, Law Office, Columbus OH, David B. Alden, Jones, Day, Reavis & Pogue, Cleveland, OH, for R.J. Reynolds Tobacco Company, defendant.

George A. Nilson, Piper & Marbury, Baltimore, MD, Raymond G. Mullady, Jr., Piper Marbury Rudnick & Wolfe, LLP, Baltimore, MD, Paul Joseph Day, Piper and Marbury, Baltimore, MD, for Brown & Williamson Tobacco Corporation, defendant.

## MEMORANDUM OPINION

SMALKIN, District Judge.

Now before the Court is defendants' joint motion for summary judgment on plaintiffs' wrongful death and survivorship claims that defendants, cigarette manufacturers, caused the death of Edward White, a smoker who developed lung and brain cancers. Also before the Court is defendants' motion to strike the affidavit of plaintiffs' expert, Allan Feingold, M.D. The motion for summary judgment has been fully briefed, and no oral hearing is deemed necessary. Local Rule 105.6 (D.Md.). For the reasons that follow, defendants' motion for summary judgment will be granted.[1]

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment shall be entered If "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The non-moving party is entitled to the benefit of all reasonable inferences from the evidence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). But the court should consider only reasonable inferences from the evidence. As the Fourth Circuit has stated, "[I]t is the province of the jury to resolve conflicting inferences front circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.), cert. denied, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958).

## II. DISCUSSION

Plaintiffs' decedent, Edward D. White, began to smoke in 1952, at age sixteen, and smoked for over thirty years. He smoked "Kools" (made by B & W) since the early 1960s, and then, in 1978, he switched to "Winstons" (made by RJR). Mr. White began to smoke while he lived in Pennsylvania, where he attended public schools. He moved to Maryland as a

---

1. B & W's "Motion to Determine Sufficiency of Plaintiffs' Answers to Requests for Admission," filed April 11, 2000, is MOOT, in light of the Court's ruling herein.

young adult, where he lived most of his smoking life. In 1984, he quit smoking (by some accounts). In 1995, in Pennsylvania, he was diagnosed with cancer, and he died on December 18, 1996. On November 19, 1997, plaintiffs filed a complaint in the Circuit Court for Baltimore City, which was removed to this Court on December 12, 1997.

Plaintiffs' seventeen-count, forty-page, complaint contains three general theories of recovery: (1) civil conspiracy; (2) negligence; and (3) strict products liability.[2] The negligence and strict liability theories are based on defective design and failure to warn claims. The complaint also contains loss of consortium claims and a request for punitive damages.

### A. Conflict of Law

■ Plaintiffs' view is that Pennsylvania law applies, because that is where Mr. White's cancer was diagnosed, and defendants' view is that Maryland law applies, because that is where Mr. White's cancer began. Maryland's choice of law rules control. *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Maryland adheres to the *lex loci delecti* principle in tort cases, which states that the locus of a tort is where the last act required to complete it occurred. *Wells v. Liddy,* 186 F.3d 505, 521 (4th Cir.1999). Here, the last act was Mr. White's diagnosis of cancer, which occurred in Pennsylvania.

■ Nevertheless, the Court's view is that Maryland law, applies for the reasons stated in *Farwell v. Un,* 902 F.2d 282 (4th Cir.1990), a diversity wrongful death/survivorship action. In that case, the wife of a suicide victim sued two doctors in a Maryland district court. The alleged wrongful conduct occurred in Maryland (not putting victim into protective custo-

dy), and the last act to complete the alleged tort (the suicide) occurred in Pennsylvania. The district court applied a "common sense" exception to the *lex loci* rule and applied Maryland law, and the Fourth Circuit upheld the application of Maryland law. *Id.* at 286. According to the Fourth Circuit, Maryland's wrongful death statute (which a federal court sitting in Maryland looks to for choice of law, determinations) "specifically identified the locus of the 'wrongful act' . . . as the critical choice of law determinant in wrongful death actions with multi-state connections." *Id.* at 287. Thus, there is a "place-of-wrong's-standard-of-care" exception to the classic *lex loci* rule, thereby displacing in this context the "last-act-to-complete-the-tort" aspect of that rule. *Id.* Guided by *Farwell* in this case, this Court concludes that Maryland lay applies because most of the wrongful acts charged to defendants occurred in Maryland, where Mr. White lived most of his smoking life.

### B. Dr. Feingold's Affidavit

Dr. Allan Feingold is a medical doctor with specialties in internal medicine and pulmonary medicine. Although the Court will deny defendants' motion to strike Dr. Feingold's affidavit, most of Dr. Feingold's lengthy (ninety pages) affidavit is irrelevant and thus inadmissible under Federal Rules of Evidence 701–703, and for that reason insufficient to stave off summary judgment. *See* Fed.R.Civ.P. 56(e). It is plain that the affidavit is a boilerplate affidavit, prepared with the purpose of submitting it in any cigarette case that may arise, by simply changing the case name at the bottom of each page, with the hope that it will create a dispute of material fact on *some* issue. One example of the irrelevant content of Dr. Feingold's affidavit is the discussion, complete with graphs, of "vegetable consumption and cigarette smoking"[3]—not an issue before this Court.

---

**2.** In addition, plaintiffs filed a seven-page Amended Complaint with more factual averments and another count (eighteen), conspira-

cy to commit constructive fraud. On July 14, 1998, plaintiffs dropped count eighteen.

**3.** Dr. Feingold has analyzed raw data from an American Cancer Society study. He states,

**428**

The narrow issues that Dr. Feingold discusses that are relevant are insufficient to create a triable issue under *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), as discussed *post.*

### C. Civil Conspiracy

 Plaintiffs allege (for about fourteen pages) that defendants conspired with, among others, Philip Morris Inc., Liggettt & Myers Tobacco Co., the Tobacco Institute Research Counsel, and the Tobacco Institute, for the general purpose of keeping the public misinformed about the dangers of smoking. It is well established that a conspiracy, or agreement to do a wrongful act, is not itself a tort; rather, some act must be committed by one of the parties in furtherance of that agreement, which is itself a tort, and which injured plaintiffs. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.,* 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994) ("'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff"); *Robinson v. Parks,* 76 Md. 118, 135, 24 A. 411 (1892) ("[A] conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a right of action."). Thus, plaintiffs must show that defendants committed some underlying tort. The Court rules that plaintiffs may base their conspiracy claim on the underlying tort of fraudulent

misrepresentation only.[4] A fraudulent misrepresentation claim may include concealment of a material fact with the inend to defraud, provided the plaintiff suffers damage as a result, and if "there exists a separate duty of disclosure to plaintiff by defendant." *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232, 469 A.2d 867 (1984), *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985).

Among the several elements that plaintiffs must prove to succeed on a fraudulent misrepresentation claim is that the plaintiff (here, plaintiffs' decedent) reasonably relied on the misrepresentations. *See Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.,* 340 Md. 176, 195, 665 A.2d 1038 (1995), 340 Md. 176, 665 A.2d 1038 (1995) (listing elements of fraud). *See also Philip Morris Inc. v. The Honorable Edward J. Angeletti,* 358 Md. 689, 751 n. 29, 752 A.2d 200 (2000) (decertifying statewide tobacco class action case and noting that fraudulent misrepresentation/omission claims against cigarette manufacturer "require not only proof of reliance but proof of reliance of such on an individual basis."); *see also id.* at 230 n. 25, 752 A.2d 200 ("[c]entral not only to the reliance element in a civil claim of fraud in [Maryland] but to the very tort itself is that there have been some sort of misrepresentation by the defendant to the plaintiff, *i.e.* some communication or material omission which the plaintiff relied upon and which caused him or her injury").

"the never smokers who ate few vegetables and the never smokers who ate a large number of vegetables every week were compared to the current smokers who ate little in the way of leafy green vegetables and the current smokers who ate a lot of vegetables." He concludes that "smoking is of much greater importance in the development of lung cancer than is green vegetable consumption." Aff. at 14. The effect of eating vegetables on contracting cancer may be of interest to some people, but that does not make it relevant to any, issue in this case.

4. The Court bases this ruling on the allegations contained in plaintiffs' complaint as well

as plaintiffs' statement that their civil conspiracy claim is based on "misrepresentation/concealment of the health risks of smoking." Opp'n at 11–12. To the extent that plaintiffs do not rely on the Underlying tort of fraudulent misrepresentation/concealment, see Opp'n at 9 ("Plaintiffs' Claim is Not Premised Upon Underlying Fraudulent Misrepresentation"), it is unbeknownst to this Court (or obviously the defendants) what underlying tort they do rely on, and, for that reason, the civil conspiracy claim fails under Federal Rule of Civil Procedure 8, for failure to include a short and plain statement of the claim showing that the pleader is entitled to relief.

Plaintiffs make the bald assertion that "Mr. White's conduct demonstrates a substantial reliance on the circumstances of Defendants' advertising and promotion...." Opp'n at 10. The evidence does not support plaintiffs; to the contrary, there is no evidence that White ever saw or heard anything that B & W or RJR said; thus, it follows that plaintiffs cannot prove that White relied (reasonably or otherwise)[5] on any statements or advertisements made by defendants. White's family members testified that they did not know whether White ever received literature from defendants, ever talked to defendants' employees, ever heard from a cigarette manufacturer that cigarettes were not addictive, ever heard of the "Frank Statement to Cigarette Smokers,"[6] or ever heard from cigarette manufacturers that cigarettes were unrelated to cancer. Indeed, Mr. White's wife testified that she has no idea why Mr. White started to smoke or why he smoked a particular brand; he "just smoked what he wanted to smoke."

■ The one shred of evidence that plaintiffs offer on the issue of reliance falls far short of what is necessary to avert summary judgment. Russell White, Mr. White's son, testified that his father "started smoking, Winston because we would always see the Winston Cup Races, so he started smoking Winston." Dep. at 23. At these races, Russell White (but not his father) accepted free cigarettes in exchange for completing a questionnaire about his smoking habits. Russell White also testified (in conflict with his other testimony) that his father already smoked Winstons at the time of the races, and that his father chose Winstons so that he and his son could share a brand that was tolerable to both of them (in taste), in case they had to borrow a cigarette from each other. He also testified that he does not remember seeing any cigarette advertisements at the races. Viewing this evidence with all reasonable inferences in favor of plaintiffs, the Court concludes that it does not show that RJR made any representations of material *fact* relevant in any fashion to product safety about Winstons—nothing at all was said about the safety of cigarettes in general, or Winstons in particular, except, perhaps, some sort of suggestion that they tasted good or were worth of purchase because they sponsored races. Thus, it cannot serve as evidence to show that Mr. White relied on any misrepresentations in continuing to smoke, or in choosing Winstons as his brand.

In short, there is no evidence that defendants said or did anything (or failed to say or do something) that influenced Mr. White's smoking behavior in any relevant way. Therefore, as a matter of law, plaintiffs cannot prove an essential element of their underlying fraudulent misrepresentation claim reliance and summary judgment is appropriate on the civil conspiracy claim,

---

**5.** Even if plaintiffs had evidence that Mr. White relied on any misrepresentations, they could not show such reliance was reasonable, in light of the *overwhelming* evidence of the widespread knowledge that cigarettes were dangerous even as early as 1950. See discussion, *infra*.

**6.** The "Frank Statement" was issued in 1954 by numerous sponsors, including cigarette manufacturers B & W and RJR, after medical reports linked smoking and lung cancer. The statement begins, "Recent reports on experiments with mice have been given wide publicity as a theory that cigarette smoking is in some way linked with lung cancer in human beings." The statement describes the experiments as inconclusive, but that the "serious medical research" performed by "doctors of professional standing" should not be disregarded or lightly dismissed. The cigarette manufacturers stated that they "accept an interest in people's health as a basic responsibility," that "[w]e believe the products we make are not injurious to health" and that they, would cooperate with the public health community. The statement continues, "For more than 300 years tobacco has given solace, relaxation and enjoyment to mankind. At one time or another during those years critics have held it responsible for practically every disease of the human body. One by one those charges have been abandoned for lack of evidence."

unless, for some reason, plaintiffs in this case are excused from the ordinary requirement to prove reliance.

Plaintiffs advance two theories to support their contention that they need not prove reliance in this case, neither of which has merit.

*a. Misrepresentations Were Made to Third Parties.* Plaintiffs assert that because they do not base their civil conspiracy claim on allegations that defendants made fraudulent misrepresentations *to Mr. White or plaintiffs*, but, rather, to third persons such as government officials, physicians, and teachers, they need not prove reliance.[7] *See* Opp'n at 10 ("Glaringly absent from plaintiffs' allegations is any contention that the defendants made a fraudulent misrepresentation to the plaintiff.").

■■■ Plaintiffs' argument fails because, under Maryland law, there is no fraudulent misrepresentation cause of action for statements made to third parties. *See Parlette v. Parlette,* 88 Md.App. 628, 635, 596 A.2d 665 (1991). Even if there were such a cause of action, it would fail because plaintiffs do not have evidence (or even allegations) of reliance by those third persons allegedly deceived. Even in cases that have held that a defendant may be liable for an injury to a consumer for misrepresentations to someone else (*e.g.,* a person buys a product that is then used by her guest or child, who is injured by product), the plaintiff must prove that the purchaser herself bought the product in reliance on the manufacturers' representations. *See* Restatement (Second) of Torts § 402B cmt. j.

■ *b. Presumption that Mr. White Relied on Misrepresentations.* Plaintiffs ask the Court to presume White would have seen or heard defendants' misrepresentations, because White read the newspaper and magazines, watched television, and listened to the radio where these misrepresentations were made. The Court will not presume anything of the kind, because such a presumption would be nothing but speculation. *See Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 171 (5th Cir.) (affirming summary judgment for defendants on fraudulent misrepresentation/concealment claim because plaintiff only showed decedent read magazines containing cigarette advertising as opposed to reading and relying upon advertisements themselves), *cert. denied,* 519 U.S. 930, 117 S.Ct. 300, 136 L.Ed.2d 218 (1996).

In sum, plaintiffs' failure of proof on the issue of reliance, an essential element of plaintiffs' underlying tort claim, entitles defendants to summary judgment on plaintiffs' civil conspiracy claim.

■■■ To the extent that plaintiffs' civil conspiracy claim rests on allegations of fraudulent concealment, it fails for the additional reason that defendants did not have a duty to speak to Mr. White.[8] A fraudulent concealment claim may be maintained only if the plaintiff suffers resulting damage, and if "there exists a separate duty of disclosure to plaintiff by defendant." *Finch,* 57 Md.App. at 232, 469 A.2d 867; *See also Morris v. Osmose Wood Preserving,* 340 Md. 519, 547 n. 12, 667 A.2d 624 (1995) ("Non-disclosure ... has never been sufficient to establish fraud, in any context, absent some duty to

---

7. It is understandable why defendants assumed plaintiffs' claim was that *Mr. White* relied on the alleged misrepresentations, since that is what the complaint avers. Compl. ¶ 74. ("Decedent relied on some or all of the statements and representations made by the conspirators and was directly and proximately damaged as detailed above."). The complaint does not aver that any of the third persons relied on the conspirators' representations.

8. To the extent plaintiffs' fraudulent omission claim is based on post-June 1969 omissions, it is preempted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331 *et seq. Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion).

disclose"). A duty to speak arises when one party is in a fiduciary or confidential relationship with the other, *see City of Rome v. Glanton,* 958 F.Supp. 1026, 1038 (E.D.Pa.1997), and at times when one party makes a "partial and fragmentary statement of fact." *Brager v. Friedenwald,* 128 Md. 8, 32, 97 A. 515 (1916).

■ In this Court's judgment, the arms-length relationship between defendant cigarette manufacturers and White, the consumer of their products, does not create a special relationship that gives rise to a duty to speak. The fact that these manufacturers made cigarettes, as opposed to some other product, does not show that they played a fiduciary role in Mr. White's life and thus entered into a special and confidential relationship with him. *See Witherspoon v. Philip Morris, Inc.,* 964 F.Supp. 455, 461–62 (D.D.C.1997) ( [plaintiff's] continued use of [cigarettes], her continued use of promotional activities offered by defendant, and by her continued addiction to the products sold by defendant … does not resemble a confidential relationship and "is not enough to create a relationship of trust").

■ Moreover, defendants' issuance of the "Frank Statement to Cigarette Smokers," including the statement that they "accept an interest in people's health as a basic responsibility," and that they would cooperate with the public health community, did not create a duty to speak to Mr. White about the health risks of smoking, given that there is no evidence that White saw or relied on the "Frank Statement" or in any other way entered a special relationship of trust and confidence with the defendant cigarette manufacturers. Finally, the Court rejects plaintiffs' argument that defendants had a duty to speak about the risks of cigarette smoking because "the manufacturer of a product owes a duty to give the user or consumer

of its product all warnings of the possible risks of using the product" Opp'n at 11, because the law does not impose such a broad duty to warn on the manufacturer of any product. *See Mazda Motor of America v. Rogowski,* 105 Md.App. 318, 327, 659 A.2d 391, *cert. denied,* 340 Md. 501, 667 A.2d 342 (1995) ("There is no duty to warn on the part of a manufacturer or supplier of a product if the plaintiff knows, should know, or reasonably may be expected to know of a particular danger inherent in a product…. ").

Given that defendants had no duty to speak to Mr. White about information regarding cigarettes, defendants cannot be held liable for concealing any such information, and defendants are entitled to summary judgment on the civil conspiracy claim to the extent it is based on alleged fraudulent concealment.

*D. Strict Liability*

The Restatement (Second) of Torts § 402A [9] makes sellers strictly liable for physical harm caused by a product "in a defective condition unreasonably dangerous to the user…. " Plaintiffs allege that defendants' cigarettes were "defective and unreasonably dangerous" because they caused serious disease (including lung cancer), were highly addictive, failed to perform as safely as an ordinary consumer would expect, failed to contain sufficient warnings,[10] because the risk of danger from the design of the cigarettes outweighed the benefits of the use of the cigarettes, and because they were designed defectively.

The insurmountable obstacle to recovery on plaintiffs' strict liability claim is comment I to § 402A, known as the consumer expectation test: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordi-

---

9. Maryland has adopted § 402A. *See Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976).

10. Plaintiffs' remaining strict liability failure-to-warn claims are analyzed *infra,* section F.

**432**

nary knowledge common to the community as to its characteristics."

Defendants' evidence overwhelmingly shows that the "ordinary consumer" during the years that Mr. White purchased and smoked cigarettes would have contemplated the dangers of cigarettes. In his uncontradicted affidavit, J. Frederick Fausz, Ph.D., a tenured associate professor of American History at the University of Missouri, states that he has concluded that public awareness of the dangers of smoking (including its addictive nature) was so widespread since the 1950s that "a thoughtful and prudent person would have had to consciously ignore prominent warnings in deciding to begin smoking cigarettes . . . ." Fausz Aff. at 2.

Dr. Fausz supports his conclusion with a plethora of specific evidence, including songs, cartoons, movies, newspaper articles, and even school textbooks that existed during the years Mr. White smoked.[11] For example, Dr. Fausz cites the July 1954 Gallup Poll, that revealed that almost 90 percent of respondents answered "Yes" to the question, "Have you heard or read anything recently to the effect that cigarette smoking may be a cause of Cancer of the Lung?" Fausz Aff. at 5. A front page article of the December 12, 1952 Frederick Post (the local newspaper that Mr. White read in his adult life), headlined "Death From Lung Cancer Increases as Tobacco Use Rises, Doctors Discover," [12] reported that the British Medical Journal "concluded that the association between smoking and carcinoma cancer of the lung is real" and that similar United States studies "reached much the same general conclusion." Fausz Aff.App. 3.[13] In addition, Dr. Fausz notes that several school textbooks in the town where Mr. White attended school contained the message that smoking was harmful.[14]

Plaintiffs concede that "there have been public statements condemning tobacco for centuries," Opp'n at 14, but, to rebut defendants' § 402A "common knowledge" defense, they offer evidence of public statements that called these condemnations into question. Plaintiffs offer, for example, the "Frank Statement to Cigarette Smokers," wherein cigarette manufacturers told the public that "tobacco has been blamed for practically every disease of the human body, but that, one by one, those charges have been abandoned for lack of evidence." Pls.' Ex. 6.

 This Court's view is that the existence of information downplaying the dangers of smoking does not undermine the

---

11. Dr. Fausz traces the knowledge of the harmfulness of cigarette smoking back to the late 19th century. He notes that in 1886, in Maryland, cigarettes were referred to in the popular culture as "coffin nails."

12. While it is true that Mr. White had not yet begun to smoke, and did not yet live in Frederick, Maryland, when this article was published, the article is relevant to the community knowledge once he arrived in Frederick.

13. Attached to Dr. Fausz's affidavit are many newspaper articles (dated from 1949) that he relied on in his research, including "Excessive Cigarette Smoking Linked to Lung Cancer Cause" (Baltimore Sun, Oct. 1949), "Higher Death Rate For Users of Cigarettes" (Frederick Post, June 1954 front page), "Surgeon General Links Smoking To Cancer; Critics Attack Data" (Baltimore Sun, Nov. 1959 front page), "Young Adults Are Advised Not To Smoke/Lung Cancer, Heavy Smoking Linked in Health Report" (Baltimore Sun, Dec. 1962).

14. Defendants also have deposition testimony from Mr. White's high school biology teacher about an experiment he conducted in class to show the harmful effects of smoking. He injected condensed cigarette smoke into live birds. The injection irritated the birds, and, if enough smoke was injected, the birds became paralyzed and fell to the floor. Kemp Aff. Plaintiffs think it is "absurd" for defendants to refer to the uncontrolled experiment, especially where there is no evidence that Mr. White was present. The Court considers the experiment one more piece of information that goes to the "common knowledge" in Mr. White's community about the dangers of smoking, whether or not Mr. White was present. A student in the class remembers being "kind of shocked" with what happened to the bird.

conclusion that any ordinary consumer would still have contemplated those dangers during Mr. White's smoking career. Even a consumer faced with conflicting information about the risks of smoking would have known there was a real chance that the information from reliable sources alerting him to the dangers was correct. Dr. Feingold's opinion that smokers in the 1940s–1960s "did not have a real understanding of the risks of cigarette smoking," is insufficient to create a dispute on the issue of what the ordinary consumer would have contemplated about the dangers of smoking. A scientific understanding is not what is called for in this context. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("mere existence of a scintilla of evidence" insufficient).

Plaintiffs argue that the Court should adopt a modified consumer expectation test: whether an ordinary *minor* in 1956 would have known that cigarettes cause lung cancer. Plaintiffs have provided no case law wherein a court has adopted a modified test, and this Court declines to do so. The Court also declines to accept plaintiffs' suggestion that the § 402A consumer expectation test requires that the common knowledge of the community be specific as to the danger of developing lung cancer, especially where, as here, the evidence shows that the ordinary consumer would have known that cigarettes could cause a fatal disease, though not necessarily the specific fatal disease involved.

In sum, defendants' evidence overwhelmingly shows, such that a reasonable juror could not decide otherwise, that the dangers of cigarettes, including the danger of addiction, have been contemplated by the ordinary consumer "with the ordinary knowledge common to the community" since the 1950s, both generally, and in Mr. White's community. Indeed, the popular 1947 hit song "Smoke! Smoke! Smoke! (That Cigarette)" was indicative of what an ordinary consumer during Mr. White's smoking days would have contemplated about the dangers of smoking:

Smoke, smoke, smoke that cigarette.

Puff, puff, puff, and if you smoke yourself to death,

Tell Saint Peter at the Golden Gate

That you hate to make him wait.

But you've got to have another cigarette.

Defendants are entitled to summary judgment on the strict liability claims, because Mr. White's cigarettes were not "unreasonably dangerous," that is, "dangerous to an extent beyond that which would be contemplated by the ordinary consumer ... with the ordinary knowledge common to the community."

### E. Defective Design

Plaintiffs claim that defendants' cigarettes were defectively designed because (1) they are inherently dangerous and addictive, and (2) they lacked various safer design alternatives, *e.g.*, reduced tar, vent holes, stop-smoking marks, lowered nicotine deliveries, smaller-sized cigarettes, and packages with fewer cigarettes.

### 1. Proof of Alternative Feasible Design

To succeed on a defective design claim, plaintiffs must prove that an alternative, feasible design existed at the time of the alleged defect. *See Nissan Motor Co. v. Nave*, 129 Md.App. 90, 119, 740 A.2d 102, 118 (1999) ("Maryland requires a plaintiff in a design defect case to prove ... [t]he existence of an alternative design that is safer than the design used in the suspect product"), *cert. denied*, 357 Md. 482, 745 A.2d 437 (2000). Dr. Feingold (pages 57–62) states that it "was feasible for the industry to greatly reduce or remove nicotine from cigarettes," and he proposes alternative designs that he considers safer. Dr. Feingold's affidavit does not assist plaintiffs because, again, he is not qualified to testify on how to design a safer, commercially feasible cigarette, being a subject beyond his expertise in internal medicine and pulmonary medicine. And, though he has plenty of experience

treating patients who smoked, this alone is insufficient to enable him to offer proof of an alternative cigarette design that works.

### 2. Causation

■ In addition, plaintiffs must prove that any defective design in defendants' cigarettes was the proximate cause of White's injuries. *See Nave,* 129 Md.App. at 119–20, 740 A.2d 102; *Jensen v. American Motors Corp., Inc.* 50 Md.App. 226, 437 A.2d 242 (1981) (negligence or strict liability claims of defective design require proof of (1) defect, (2) when it left defendant's control and (3) the defect caused the injury). To do so, plaintiffs must show that White would have accepted and used the alternatively designed cigarette, *id.* at 119–20, 740 A.2d 102, and plaintiffs have not created a dispute on this issue. Indeed, plaintiffs concede that "[I]t is virtually impossible to assess, ... how [Mr. White] would have responded to hypothetical different products which were hypothetically available, and which were hypothetically safer." Opp'n at 23. The American Cancer Society distributed, as early as 1967, information that "the less tar and nicotine you inhale the better," which shows the relative amounts of tar and nicotine in different brands of cigarettes. Although these reduced tar cigarettes were available to Mr. White, he smoked "full flavor" Winstons. Although the Court recognizes that plaintiffs are at a disadvantage because Mr. White has died, that fact does not shift the burden from plaintiffs to prove the crucial issue of causation, and, because they have failed to produce sufficient evidence thereof, defendants are entitled to summary judgment on the defective design claims.

### F. Failure to Warn[15]

Defendants argue that plaintiffs' remaining failure-to-warn claims fail for two reasons: (1) there is no duty to warn of commonly-known risks, and (2) plaintiffs have no evidence of causation, *i.e.,* that White's injury would not have occurred if defendants had given an adequate warning.[16] The Court agrees.

### 1. Commonly–Known Risk of Smoking

■ "[A] seller is not required to warn ... when the danger, or potentiality of danger, is generally known or recognized." Restatement (Second) of Torts § 402A cmt. j. It is this Court's steadfast opinion, based on the evidence before it, that general knowledge of the dangers of cigarette smoking dates back at least to 1952, when Mr. White began to smoke. Indeed, the dangers have been so well known and recognized that one who chose to smoke can blame only himself when those dangers (including the danger of contracting a fatal disease) come to pass; he cannot blame (and thus collect money damages from) those who made the product available. *See Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 172 (5th Cir.) ("the dangers of cigarette smoking have long been known to the community"), *cert. denied,* 519 U.S. 930, 117 S.Ct. 300, 136 L.Ed.2d 218 (1996); *Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988) (quoting with approval district court's conclusion that

---

**15.** Although plaintiffs have brought both negligent failure-to-warn claims and strict liability failure-to-warn claims, the Court treats them the same analytically because, for negligence claims, there is no duty to warn of obvious dangers, *see Rogowski,* 105 Md.App. at 330–31, 659 A.2d 391, and, for strict liability claims, a "seller is not required to warn" of generally known risks. *See* Restatement (Second) of Torts § 402A cmt. j.

**16.** Most of plaintiffs' failure-to-warn claim is limited to pre-June 1969 conduct of B & W

because conduct that occurred after that time is preempted (as the Court has held previously). White smoked B & W's "Kools" from 1956, whereas he did not smoke RJR's "Winstons" until 1978. The only post-June 1969 failure-to-warn claim that survived preemption dismissal does not survive summary judgement, because (in addition to the reasons the pre-June 1969 claims fail) plaintiffs have not produced evidence of any non-advertising channel of communication.

"tobacco has been used for over 400 years and [its] characteristics have also been fully explored. Knowledge that cigarette smoking is harmful to health is widespread and can be considered part of the common knowledge of the community"); *Tompkin v. American Brands, Inc.,* 10 F.Supp.2d 895, 905 (N.D.Ohio 1998) ("the health risk from smoking, particularly the risk of lung cancer, was 'common knowledge' in 1950"). *See supra,* discussion of defendants' overwhelming evidence of widespread knowledge of dangers of cigarettes. Thus, plaintiffs cannot recover on their failure-to-warn claims, because the dangers of smoking cigarettes were commonly known, and defendants had no duty to warn of such risks.

### 2. Causation

An essential element of plaintiffs' failure-to-warn claims is causation—plaintiffs must show that if an adequate warning had been given (prior to June 1969), Mr. White would have heeded it, and his injury (diagnosed in 1995) would have been avoided.

▆▆▆ In some jurisdictions, including Maryland, there is a presumption in strict liability cases that a plaintiff would have read and heeded an adequate warning if it had been given. *See, e.g., Eagle–Picher v. Balbos,* 326 Md. 179, 229, 604 A.2d 445 (1992) ("direct evidence that plaintiffs' decedents would have heeded adequate warnings was not an essential element of the plaintiffs' case"). The presumption may be rebutted, however, where there is "evidence that the personalities or dispositions of the particular decedents were such that they clearly would have ignored warnings." *Id.*

▆▆▆ The evidence shows precisely what Mr. White would have done had he been warned that smoking was dangerous prior to June 1969: he would have kept on smoking. When federally-mandated warnings on the pack itself appeared in the mid–1960's, Mr. White continued to smoke. From 1966–1970, every cigarette package Mr. White bought warned "Caution: Cigarette Smoking May Be Dangerous to Your Health," and after 1970 every cigarette package that Mr. White bought stated "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." Just as these later-issued warnings were futile in altering Mr. White's smoking behavior, any earlier-issued warnings likewise would obviously have been futile. And the lack of futile warnings, of course, cannot have caused Mr. White's injury. Moreover, in her affidavit, Amy Miller, Mr. White's friend, states that she (also a smoker) and Mr. White had discussed the serious health risks of smoking, including the warning labels on the packages. According to Ms. Miller, Mr. White knew about risks of smoking, but his attitude was "something is going to kill us" and "I have to die of something." Miller Aff. ¶ 10.

The evidence shows that Mr. White would have ignored warnings had they been given, and thus, no reasonable juror could conclude that a warning would have been efficacious, and prevented Mr. White's injuries. Thus, plaintiffs cannot meet their burden of proving causation,[17] and for this reason as well as because the risks of smoking cigarettes were common knowledge, their failure-to-warn claims do not survive summary judgment.

### G. Loss of Consortium and Punitive Damages

In light of the Court's rulings, the derivative claims of loss of consortium and punitive damages must fail. *See VF Corp. v. Wrexham Aviation,* 350 Md. 693, 703, 715 A.2d 188 (1998) (punitive damages); *Oliver*

---

**17.** Another causation problem is the large time gap (sixteen years) between defendants' failure to warn in the 1960s (the claims that survived preemption dismissal) and the development of the first malignant cancer cells, which according to plaintiffs' expert, Victor Louis Roggli, M.D., would have been in 1985 (five to ten years before the 1995 diagnosis).

**436**

*v. Raymark Indus.*, 799 F.2d 95 (3d Cir. 1986) (loss of consortium).

### III. CONCLUSION

In the end, this case boils down to the fact that Mr. White—in its common, if not its legal, sense—assumed the risks of smoking, as evidenced by his own telling remark: "I have to die of something." Based on the foregoing discussion, the Court will deny defendants' motion to strike Dr. Feingold's affidavit, and the Court will grant defendants' motion for summary judgment, by separate order.

### JUDGMENT ORDER

For the reasons stated in the Memorandum Opinion of even date, it is, by the Court, this 25th day of July, 2000, ORDERED and ADJUDGED:

1. That defendants' motion for summary judgment BE, and the same hereby IS, GRANTED;

2. That defendants' motion to strike the Feingold affidavit, BE, and it hereby IS, DENIED;

3. That' judgment BE, and it hereby IS, ENTERED in favor of all defendants, against plaintiffs; and

4. That the Clerk mail copies hereof and of the said Opinion to counsel.