**Robert WATERHOUSE Plaintiff**

v.

**R.J. REYNOLDS TOBACCO COMPANY, et al.**
**Defendants**

**No. CIV. PJM 02–2446.**

United States District Court,
D. Maryland.

March 24, 2005.

See also, 270 F.Supp.2d 678.

George A C Harper, Esquire, Upper Marlboro, MD, for Plaintiffs.

Blaney Harper, Washington, DC, Paul R Reichert, Washington, DC, Peter J Biersteker, Washington, DC, George A Nilson, Baltimore, MD, George F Ritchie, IV, Baltimore, MD, Mark W Carmean, Chesapeake Beach, MD, Paul Joseph Day, Baltimore, MD, for Defendants.

### OPINION

MESSITTE, District Judge.

Of the multiple legal theories on which Plaintiff Robert Waterhouse sued Defen-

dants R.J. Reynolds Tobacco Company and Brown & Williams Tobacco Corporation for injuries sustained while smoking, only two remain—pre–1969 failure to warn sounding in negligence and the same failure to warn sounding in strict liability.[1] Defendants now move for summary judgment with respect to those counts. Having considered the pleadings and oral argument of counsel, the Court will GRANT Defendants' motion.

### I.

Waterhouse began smoking in approximately 1947 at age 17 and continued to smoke until 1984, some 37 years thereafter. He smoked Lucky Strikes (made by Brown & Williamson) until the mid–1950s, Pall Mall's (also made by Brown & Williamson) until the early 1960s, and Winston's (made by Reynolds) until December 1984, when he quit smoking altogether. Beginning as early as high school in the late 1940s, and continuously during the period he was a smoker, Waterhouse was urged by family, friends and physicians to give up the habit for health reasons. In the latter part of 1984, one year after he had ceased smoking, several doctors diagnosed him as having chronic obstructive pulmonary disease. In 1999 he was diagnosed with squamous cell lung cancer and had surgery to remove the cancer. He has received regular testing and x-rays since then to check for reoccurrence of the cancer.

### II.

Defendants argue that they are entitled to summary judgment for two reasons: First, because the health risks of smoking, including lung cancer, have been commonly known throughout Waterhouse's lifetime

---

1. The Court's discussion of the majority of the counts no longer in play appears in *Waterhouse v. R.J. Reynolds Tobacco Co.,* 270 F.Supp.2d 678 (D.Md.2003). At oral argument on the present motion, counsel for Waterhouse conceded he was unable to prove design-defect claims based on negligence and strict liability.

(a datum which must be proved by competent expert testimony, which Defendants say they have produced but which they say Waterhouse has not); second, because Waterhouse cannot show that Defendants' alleged failure to warn of the danger of smoking prior to 1969 proximately caused his injuries.

Waterhouse replies:

Defendants can only establish the defense of common knowledge by demonstrating that the ordinary consumer knew of the *specific* hazard which causes a plaintiff's injury, which they have not done. Further, either expert testimony is not necessary to establish common knowledge or Waterhouse's expert, Dr. Allan Feingold, is competent to opine on the issue and he says most smokers did not have a real understanding of the risks of smoking in the relevant time period. Finally, as to causation, a genuine issue of material fact exists on the basis of Waterhouse's own testimony that he would not have started smoking if he had known that cigarette smoking could cause lung cancer.

### III.

Summary judgment is appropriate if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The court does not weigh the evidence, but determines only if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes are found, summary judgment will be granted against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof at trial. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

Evidence is viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990), and the non-moving party is entitled to the benefit of all reasonable inferences from the evidence. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### IV.

Of all the cases the parties ask the Court to consider, one stands out above all others and guides the Court's decision in the present case, *Estate of White v. R.J. Reynolds Tobacco Co.,* 109 F.Supp.2d 424 (D.Md.2000).[2] There Judge Smalkin of this Court addressed issues essentially identical to those in the present case and resolved them in a fashion this member of the Court finds entirely fitting in the present case.

Plaintiffs' decedent in *White* had begun to smoke in 1952 at age 16, starting in the 1960s with Kools (made by Brown & Williamson) and in 1978 switching to Winston's (made by Reynolds). He moved to Maryland as a young adult, where he lived most of his smoking life. In 1984 he quit smoking and in 1995 he was diagnosed with cancer. In 1996 he died.

---

2. The Court acknowledges that courts have taken different approaches to the issues the parties dispute here. The Court, however, finds it unnecessary to discuss the relative strengths and weaknesses of these cases. In addition to being analytically sound, Judge Smalkin's opinion in *White* has been the declared law of the district for some 5 years. The Court is not inclined to introduce a contrary opinion at this advanced stage.

His personal representative and survivor eventually sued R.J. Reynolds and Brown & Williamson, for, among other things, failure to warn negligence and failure to warn strict liability. Their "expert," coincidentally, was Dr. Allan Feingold, "a medical doctor with specialties in internal medicine and pulmonary medicine." *Id.* at 427.

Judge Smalkin analyzed the failure to warn claims in negligence and strict liability as substantially equivalent since, as to negligence claims, there is no duty to warn of obvious dangers, citing *Mazda Motor of America v. Rogowski*, 105 Md.App. 318, at 330–31, 659 A.2d 391 (1995) and, as to strict liability claims, a "seller is not required to warn" of generally known risks, citing the Restatement (Second) of Torts, § 402 A comt., which has been adopted in Maryland. *See Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976).[3]

Judge Smalkin reviewed the record evidence before him. Plaintiffs' expert, J. Frederick Fausz, Ph.d., a tenured professor of American History at the University of Missouri, "concluded that public aware-ness of the dangers of smoking (including its addictive nature) was so widespread since the 1950s that 'a thoughtful and prudent person would have had to consciously ignore prominent warnings in deciding to begin smoking cigarettes.' " *Id.* at 432, 363 A.2d 955. The Judge took note of Dr. Fausz's references to "a plethora of specific evidence, including songs, cartoons, movies, newspaper articles, and even school textbooks," as well as polls, finding that "the existence of information downplaying the dangers of smoking [did] not undermine the conclusion that any ordinary consumer would still have contemplated those dangers during Mr. White's smoking career." *White*, 109 F.Supp.2d at 432–33.

On the other hand, "Dr. Feingold's opinion that smokers in the 1940s–1960s 'did not have a real understanding of the risks of smoking' [was] insufficient to create a dispute on the issue of what the ordinary consumer would have contemplated about the dangers of smoking. A scientific understanding is not what is called for in this context." *Id.* at 433.[4]

---

3. Section 402A of the Restatement (2d) imposes strict liability upon a seller for physical harm caused by a product "in a defective condition unreasonably dangerous to the user." Plaintiffs in *White* alleged *inter alia* that defendants' cigarettes were "defective and dangerous" because they caused such serious disease as lung cancer, were highly addictive, failed to perform as safely as an ordinary consumer would expect, and failed to contain sufficient warnings, *White*, 109 F.Supp.2d at 431. Judge Smalkin found that the "insurmountable obstacle" to recovery on plaintiffs' strict liability claim was the "consumer expectation test" under § 402A which provides: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.*

Defendants in the present case argue from this that their cigarettes are "not defective and unreasonably dangerous." The Court will assume, for present purposes, that cigarettes are "defective and unreasonably dangerous." The critical issues are whether adequate warnings were given and, if not, whether the absence of such warnings proximately caused Waterhouse's injuries.

4. While there is no longer a defective-design claim in the present case, it is also noted that Judge Smalkin rejected Dr. Feingold's opinion that it was feasible for the industry to greatly reduce or remove nicotine from cigarettes "because, again, he is not qualified to testify on how to design a safer, commercially feasible cigarette, being a subject beyond his expertise in internal medicine and pulmonary medicine. And, though he has plenty of experience treating patients who smoked, this alone is insufficient to enable him to offer proof of an alternative cigarette design that works." *Id.* at 433–34.

■ Judge Smalkin thus concluded that no reasonable juror could decide other than "that the dangers of cigarettes, including the danger of addiction, have been contemplated by the ordinary consumer 'with the ordinary knowledge common to the community' since the 1950s, both generally and in Mr. White's community." *Id.* at 433. He expressly rejected plaintiffs' suggestion "that the . . . § 402A consumer expectation that requires the common knowledge of the community be *specific* as to the danger of developing lung cancer, especially where, as here, the evidence shows that the ordinary consumer would have known that cigarettes could cause a fatal disease, though not necessarily the fatal disease involved." *Id.* (Emphasis supplied).

Against the framework of *White,* the Court assesses the present case.

Defendants have submitted extensive historical evidence and analysis of the state of common knowledge with respect to smoking hazards over the period 1947 to 1969, relying principally on the affidavit of Dr. Norell Ph.D., a tenured professor at the University of Tennessee specializing in twentieth century American history. Dr. Norell has analyzed the question by applying reliable professional methods used in conducting historical research in general. He examined a wide array of historical scholarship and primary sources of public knowledge about the effects of tobacco use, including the *New York Times* and other national newspapers, as well as regional and local newspapers, including the *Baltimore Sun, Norfolk Virginian–Pilot, Washington Post,* and *Washington Star.* He examined popular magazines, government documents, manuscript collections, scholarly histories, state and federal laws regarding tobacco and cigarette smoking, curriculum guides and school text books approved for use in various states (including Maryland), religious publications, polling and survey data, movies, television programs, and other forms of popular culture.[5] He attached over sixty newspaper clippings describing the link between smoking and lung cancer in the 1950s and 1960s.

Synthesizing these materials, Dr. Norell concludes that Americans throughout the twentieth century received a tremendous amount of information about the health risks of smoking. He therefore opines that between 1947 and 1969 there was widespread common knowledge among ordinary people that cigarette smoking could cause serious life-threatening diseases.

In marked contrast, Waterhouse has offered the affidavit of Dr. Feingold, who opines, as he did in *White,* that "most smokers did not have a real understanding of the risk of cigarette smoking [in the 1940s through the 1960s]." Dr. Feingold, however, reaches his conclusion without establishing what his mode of historical analysis is or whether that mode is generally considered reliable or acceptable. Indeed, Dr. Feingold has failed to demon-

5. Among other things, Dr. Norell cites a July 1954 Gallup Poll in which almost ninety (90) percent of respondents answered "Yes" to the question, "Have you heard or read anything recently to the effect that cigarette smoking may be a cause of Cancer of the Lung?" He also relates that in 1954 the *Baltimore Sun* reported that the Baltimore City Council had appointed a committee to investigate the connection between smoking and lung cancer and later that year ran a story about an American Cancer Society report under the headline, "New Data Link Cancer, Heart Ills to Smoking." He points to the 1955 CBS New's program "See It Now" which ran a two-part series that examined the possible connection between smoking and lung cancer. He refers to a *Stars & Stripes* article on lung cancer that appeared in 1948. Further, he suggests that "Smoke, Smoke, Smoke That Cigarette," a popular 1947 hit song, was indicative of what consumers in fact contemplated about the dangers of cigarettes, *i.e.* that "[y]ou smoke yourself to death."

strate his competence to offer an opinion in the matter. By his own admission, he has no education or experience in polling, surveying, or otherwise assembling data upon which historians or other experts base opinions regarding public awareness. *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

It is clear to the Court that the present case is little more than a replay of *White*. Against "overwhelming" evidence of common knowledge from an expert whose credentials, principles, and methodology are— if not impeccable—at least unchallenged, Waterhouse has produced the same "expert" to render the identical opinion that Judge Smalkin rejected as insufficient.[6] The same attempt to frame the common knowledge element to require knowledge of specific hazards, which was rejected in *White*, is exhumed here.

Waterhouse, to be sure, tries a new tack, arguing that expert testimony is actually not required on the issue of common knowledge, that documentary evidence bearing on the issue, such as the polls he has offered, should suffice. The problem, however, as Defendants point out, was articulated by the First Circuit in *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 278 (1st Cir.2003):

> [t]he 'common knowledge' defense is assessed objectively, and, despite the nomenclature, it is a technical question involving methods, financing, and sources of research beyond the competence of lay determination, at least when pertaining to history forty or fifty years removed from the time of trial."

348 F.3d at 277.

■ The Court holds that expert testimony is required with respect to the state of common knowledge of smoking hazards during the smoking career of a plaintiff and that that testimony must be rendered by competent experts. Waterhouse has not met that requirement here.

Step by step, then, the Court reaches the same conclusion Judge Smalkin reached in *White*. The record evidence leads to but one conclusion as a matter of law. Throughout Waterhouse's smoking career the dangers of smoking were so "obvious," the risks so "generally known," that no failure to warn claim can lie in negligence or strict liability. This alone supports summary judgment in Defendants' favor.

But there is also the matter of causation, a separate stumbling block which Waterhouse is unable to surmount.

### V.

■ Defendants also say that Waterhouse cannot prove that the absence of an adequate warning proximately caused his injuries, which is necessary for both his negligence and strict liability claims. He relies on his own testimony that he would not have started smoking "[i]f I had known that cigarette smoking could cause lung cancer."

Defendants are correct that Waterhouse is obliged to demonstrate a causal connection between Defendants' failure to warn and his consequent injuries. *See Eagle–Picher Indus., Inc. v. Balbos*, 326 Md. 179, 227–29, 604 A.2d 445, 468–69 (1992) ("To establish causation a plaintiff should, in theory, be required to prove not only that she would have read, understood, and remembered the warning, but also that she would have altered her conduct to avoid the injury,"); *Estate of White*, 109

---

**6.** "It is plain that the affidavit is a boilerplate affidavit, prepared with the purpose of submitting it in any cigarette case that may arise by simply changing the case name at the bottom of each page, with the hope that it will create a dispute of material fact on some issue." *White*, 109 F.Supp.2d at 427.

F.Supp.2d at 435 ("plaintiffs must show that if an adequate warning had been given (prior to June 1969), Mr. White would have heeded it, and his injury (diagnosed in 1995) would have been avoided."); *see also Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 275 (D.R.I.2000) ("To prevail on the non-preempted failure to warn claim, plaintiff would have to establish causation on two levels: 1) that a pre–1969 warning would have induced him to stop smoking and 2) that his pre–1969 smoking was the proximate cause of his 1997 cancer").

In some jurisdictions, Maryland included, there is a presumption in strict liability cases that a plaintiff would have read and heeded an adequate warning if it had been given. *See e.g. Eagle–Picher*, 326 Md. 179, 228–29, 604 A.2d 445 ("direct evidence that plaintiffs' decedents would have heeded adequate warnings was not an essential element of the plaintiffs' case."). However, this presumption may be rebutted where there is "evidence that the personalities or dispositions of the particular decedents were such that they clearly would have ignored warnings." *Id.*

Apart from his late-conceived affidavit that he would not have begun smoking had he been warned of the risk of lung cancer, Waterhouse has admitted on multiple occasions throughout discovery to a very extensive awareness of the health hazards of smoking. As a teenager he was warned by adults that smoking would stunt his growth. From his childhood, pastors at his churches spoke against smoking. In high school, his athletic coach told him and his teammates not to smoke because it would take away their wind. While in the Army, and as a civilian employed at military bases, doctors told him to quit smoking to stay healthy. His wife constantly complained about his smoking, not only because the smoke annoyed her, but because she insisted it was not good for his health.

His children urged him to stop. So did his friends. Concern for his health was always the principal reason for these implorings.

Waterhouse admits he was also aware of the health hazards of smoking as a result references in the media and popular culture. He remembers the 1947 hit tune "Smoke! Smoke! Smoke!" (That Cigarette) and its tag line "till you smoke yourself to death." He knew "cancer sticks" referred to cigarettes. He watched the news on television and read the print media about smoking hazards, including references to the Surgeon General's report. He knew of the warning labels that first appeared on cigarette packages in 1966, which read "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH." His doctors repeatedly warned him about the health risks of smoking and in the 1980s told him his chronic bronchitis was caused by his smoking. He only stopped in 1984 after his son, a physician, showed him photographs of lungs damaged by smoking.

Through it all, Waterhouse's attitude was typified by what he told his wife when she urged him to quit smoking: "Well, I'll smoke, you know what I mean. I like to smoke." More significantly, his statement on deposition that he "probably would have continued smoking" regardless of what Defendants might have said about cigarettes in their advertising incontrovertibly breaks the chain of causation.

Waterhouse's affidavit in response to Defendants' motion for summary judgment does not alter the terrain. A party cannot generate a genuine issue of material fact by making statements in an affidavit that directly contradict his sworn deposition testimony given in the case. *See e.g. Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 975 (4th Cir.1990):

In sum, no reasonable juror could find a causal connection between Defendants' alleged failure to warn of the hazards of smoking and the regrettable injuries Waterhouse has sustained.

## VI.

For these reasons, the Court will GRANT Defendants' Motion for Summary Judgment.

A separate Order will ISSUE.

### *FINAL ORDER OF JUDGMENT*

Upon consideration of Defendants' Motion for Summary Judgment [Paper No. 48], Plaintiff's Answer to Defendants' Summary Judgment [Paper No. 53], and Defendants' Reply [Paper No. 58], oral argument having been held thereon, it is for the reasons set forth in the accompanying Opinion, this 24 day of March, 2005

**ORDERED:**

1) Defendants' Motion for Summary Judgment [Paper No. 48] is **GRANTED**;

2) Final judgment is **ENTERED** in favor of Defendants and against Plaintiff; and

3) The Clerk of the Court is directed to **CLOSE** the case.